# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FACTOM, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 20-11602 (BLS) |

## CHAPTER 11 PLAN OF REORGANIZATION
## (SUBCHAPTER V)

Dated: June 18, 2020

>Julia Klein (DE 5198)
>KLEIN LLC
>919 North Market Street, Suite 600
>Wilmington, Delaware 19801
>(302) 438-0456
>klein@kleinllc.com
>
>- and -
>
>Jeffrey Chubak (pro hac vice)
>AMINI LLC
>131 West 35th Street, 12th Floor
>New York, New York 10001
>(212) 490-4700
>jchubak@aminillc.com
>*Proposed Attorneys for the Debtor*

---

[1] The Debtor's mailing address is 13492 Research Boulevard, P.O. Box 643, Austin, Texas 78750. The last 4 digits of its taxpayer identification number are 6915.

## TABLE OF CONTENTS

Page

BACKGROUND ........................................................................................................................... 1
A.    Description and History of the Debtor's Business ........................................................... 1
      1.    The Platform .......................................................................................................... 1
      2.    The Debtor's Business Prospects .......................................................................... 1
B.    Capital Structure ............................................................................................................... 2
C.    Reasons for this Chapter 11 Case ..................................................................................... 3
      1.    Estimation of SAFE Claim at $0 .......................................................................... 3
      2.    Lease Rejection ..................................................................................................... 7
D.    Liquidation Analysis ........................................................................................................ 8
E.    Ability to Make Future Plan Payments and Operate Without Further Reorganization ...... 8
ARTICLE I DEFINITIONS AND RULES OF CONSTRUCTION .............................................. 8
1.1    Definitions and Rules of Construction ............................................................................ 8
1.2    Computation of Time ....................................................................................................... 9
ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS ....................................................... 9
2.1    Administrative Expense Claims ....................................................................................... 9
2.2    Priority Tax Claims .......................................................................................................... 9
ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ......... 9
3.1    Classification .................................................................................................................... 9
3.2    Treatment ........................................................................................................................ 10
      (a)    Class 1—Priority Non-Tax Claims ................................................................... 10
      (b)    Class 2—General Unsecured Claims ................................................................ 10
      (c)    Class 3—Interests .............................................................................................. 10
ARTICLE IV MEANS FOR IMPLEMENTATION ................................................................... 10
4.1    Source of Cash for Payments to Creditors .................................................................... 10
4.2    Estimation of Claims ..................................................................................................... 10
4.3    Directors and Officers ................................................................................................... 10
4.4    Preservation of Causes of Action ................................................................................... 11
4.5    Setoff .............................................................................................................................. 11
ARTICLE V PROVISIONS GOVERNING PAYMENTS .......................................................... 11
5.1    Debtor to Make Payments ............................................................................................. 11

| | | |
|---|---|---|
| 5.2 | Delivery of Payments | 11 |
| 5.3 | Time Bar to Cash Payments | 11 |
| 5.4 | No Interest | 11 |
| 5.5 | Disputed Claims Reserve | 12 |
| 5.6 | No Payments on Disputed Claims | 12 |
| 5.7 | Resolution of Disputed Claims | 12 |
| 5.8 | Claims Objection Deadline | 12 |
| 5.9 | Withholding Taxes | 12 |
| ARTICLE VI EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 12 |
| 6.1 | Assumption/Rejection of Executory Contracts and Unexpired Leases | 12 |
| 6.2 | Rejection Damages Claims | 12 |
| ARTICLE VII DISCHARGE, RELEASE AND INJUNCTION | | 13 |
| 7.1 | Discharge | 13 |
| 7.2 | Release | 13 |
| 7.3 | Injunction | 13 |
| ARTICLE VIII MISCELLANEOUS | | 13 |
| 8.1 | Severability | 13 |
| 8.2 | Binding Effect | 13 |
| 8.3 | Captions | 14 |
| 8.4 | Governing Law | 14 |

**BACKGROUND**

A.  **Description and History of the Debtor's Business**

1.  The Platform

The Debtor is a corporation organized under Delaware law in 2014. In the years following its formation, the Debtor worked towards developing a platform that permits entities to maintain a time-stamped record of data that is permanently recorded on blockchain,[1] without the need for cryptocurrency exposure or costly infrastructure. The platform is now fully developed, and the Debtor offers two products that provide access to it.[2]

The initial, principal focus of the Debtor's business was adapting the platform for use in connection with the mortgage origination and servicing process, so as to reduce costs associated with reviews, audits, servicing transfers and underwriting submissions through reduced time and increased accuracy of file and digital asset assembly. Prior to the commencement of this case, the Debtor wound down that business segment.

The Debtor's current principal focus is adapting the platform for use by the Department of Homeland Security ("DHS") and other Federal agencies, as discussed below.

2.  The Debtor's Business Prospects

To the Debtor's knowledge, it is the first participant in the DHS Science and Technology Directorate, Silicon Valley Innovation Program ("SVIP") which is intended to provide funding for projects that deploy technology to solve problems faced by DHS and its sub-agencies. Under the program, companies are provided grants totaling up to $800,000 to develop and test technologies, in four (sometimes five) phases. For its initial project, the Debtor was awarded all four grants, totaling roughly $800,000 and successfully complete the program, qualifying it to sell up to $10 million worth of the resulting technology without the need for a competitive bidding process.[3] The Debtor was also awarded a $197,000 grant in connection with the first phase of a second

---

[1] Blockchain is a public ledger, used to record transactions in a verifiable and permanent way. Blockchain was first used as the public transaction ledger for Bitcoin.

[2] The two products are Harmony Connect and Harmony Integrate. Harmony Connect allows users to add blockchain capabilities to their systems as well as sophisticated digital identities and credentialing; however, it does not include implementation of the many digital identity implementations potentially available (although it can support any). Harmony Integrate provides pre-built implementation of the W3C standard for digital identities and credentials fully implemented and tested on the Factom protocol on which the Debtor's platform operates.

[3] Streamlined procurement procedures applicable to SVIP participants under the DHS Other Transactions Authority are generally considered to constitute competitive procedures under the Competition in Contracting Act (41 U.S.C. § 253 et seq.).

1

project being developed through the SVIP. Further information about the SVIP can be found at: https://www.dhs.gov/science-and-technology/svip.

The project for which the Debtor completed all four phases was undertaken on behalf of the United States Customs and Border Protection agency ("CPB") and concerns the use of blockchain to secure data from sensors (principally cameras) located along the United States-Mexico border. DHS has highlighted the work performed by the Debtor on its website. E.g., https://www.dhs.gov/science-and-technology/blockchain-portfolio.

Because the project was one of the first to be undertaken through the SVIP, the Debtor was not advised until after the fact that the technology developed needed to be packaged within a management, provisioning and deployment platform before it could be used within the CPB environment. DHS suggested that the Debtor partner with another firm to integrate its technology with one that could be used. The Debtor has found a potential partner with the required technology (Signal Garden), and they together have met with DHS to present a combined solution. The proposed, combined solution met with preliminary DHS approval and the Debtor and Signal Garden were asked to create a working demonstration. The Debtor anticipates the demonstration being given in July 2020. If positively received, the Debtor anticipates the procurement process running approximately four months.

If the subject technology is implemented along the United States-Mexico border, the Debtor expects the subject contract to be profitable. The Debtor anticipates the project generating engineering and consulting fees, for services rendered implementing the subject technology across several thousand sensors, and "blockchain as a service" software and license fees once implemented (and thereafter). The Debtor projects earning roughly $200,000 in engineering and consulting fees in its first year. Once the technological solution has been fully implemented the Debtor projects earning roughly $3 million/year (up to $10 million), given inter alia that the Debtor charges for the subject product based on its usage, the length of the border and the anticipated thousands of sensors that would be recording data.

In addition to working with DHS, the Debtor is a subcontractor on a project commissioned by the Department of Energy ("DOE") to protect the United States' electric grid from cyber-attack using blockchain. The Debtor was awarded $57,000 in connection with the project's first phase. The Debtor anticipates generating revenues of $125,000 in the second phase. The Debtor has also applied for a $100,000 grant in connection with a Department of Transportation project concerning application of blockchain technology to traffic control.

**B.    Capital Structure**

The Debtor believes it has approximately $350,000 in debt, as described in its Schedule D and Schedule E/F, filed June 18, 2020, excluding lease rejection damages (discussed below) and approximately $60,000 owed under a D&O insurance premium financing agreement as to which it has requested authorization to pay, and assuming the claim of FastForward Innovations Limited ("FastForward") (discussed below) is estimated at $0 as proposed herein. Of the unsecured debt, $183,677 is attributable to a PPP loan under the CARES Act that may be forgiven in whole or in part.

The Debtor has issued several classes of equity securities, ownership of which is as set forth in its list of equity security holders, filed pursuant to Rule 1007(a)(3). Copies of the Debtors' schedules and list of equity security holders shall be provided on request.

**C.     Reasons for this Chapter 11 Case**

1.     Estimation of SAFE Claim at $0

From 2015-17, the Debtor raised over $10 million from investors that included renowned venture capitalists Tim Draper of Draper Associates, Kuala Innovations, Harvest Equity and Peeli Ventures.[4]

The Debtor raised an additional $6 million pursuant to a Simple Agreement for Future Equity it entered into with FastForward, dated as of July 20, 2018 (as amended, the "SAFE"), a copy of which being filed on the docket of this chapter 11 case under separate cover and shall be provided on request.

The Debtor used capital raised by it from 2015-18 in order to inter alia pay its engineering team to build the subject platform and develop additional product features, build the Debtor's proprietary patent pool, develop a marketing and sales team, invest in tooling needed to minimize back-office overhead and cover other operating costs such as rent, utilities and insurance.

FastForward has three contingent and unliquidated claims under the SAFE.

(1) Pursuant to Section 1(a) of the SAFE, FastForward has a contractual right to preferred stock if the Debtor consummates a "Qualified Financing," defined broadly as "any financing raised in [a] bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed money valuation and/or financing raised in any Qualified Fundraising Activity, which collectively have an aggregate sales price of not less than $3,000,000." The term "Qualified Fundraising Activity" in turn "means any combination of convertible notes, other Safes, any other convertible security agreement and/or debt financing."

(2) Pursuant to Section 1(b), FastForward has a contractual right to common stock, repayment in cash of the above-referenced $6 million, or a combination of cash and common stock in the event of a "Liquidity Event," defined as a change of control or IPO; and

(3) Pursuant to Section 1(c), FastForward has a contractual right to repayment in cash of the above-referenced $6 million in the event of a "Dissolution Event," defined as "(i) a voluntary termination of operations, (ii) a general assignment for the benefit of the

---

[4] In 2015-2016, the Debtor raised $400,000 at an $11 million valuation. In 2017, the Debtor raised an additional $8 million Series A at a $38 million post-money valuation as part of an extended Series A round. Holders of all Interests (defined below) in the Debtor are set forth in the Debtor's list of equity security holders.

3

Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (excluding a Liquidity Event), whether voluntary or involuntary."

For at least a year, the Debtor has undertaken to raise additional capital; however, it has been unable to do so because of false pronouncements made by FastForward concerning its rights under the SAFE.

Specifically, on March 19, 2020, FastForward issued a press release through the London Stock Exchange's Regulatory News Service ("RNS") stating:

> It has become clear that the Company's [FastForward's] SAFE is seen by investors as an impediment to further investment in Factom, despite continued interest being expressed by multiple parties in the event that this barrier can be removed …
>
> Factom remains actively involved in negotiations with two industry parties but has notified shareholders that at the end of March 2020, without any additional support or funding, Factom Inc. will be forced to enter discussions with creditors about the distribution of its assets. At this point, the SAFE becomes a debt of $6 million and the Company will be the largest creditor. The Company has held preliminary discussions with management regarding a potential restructuring of Factom and its creditors, but any deal requires fresh investment in Factom by existing and new investors. The Company has indicated that as part of a syndicate it may provide further funding to Factom but will not lead the fundraise on its own.
>
> In any scenario, based on the proposals FastForward is aware of, it is highly likely that there will be a very significant impairment to the value of the Company's investment in Factom. The impact on the carrying value will depend on the result of discussions as part of any fundraise. At the very least it is the Directors' belief that any realization of the investment in its entirety will be delayed for the foreseeable future.
>
> The current global financial markets uncertainty caused by the Covid-19 outbreak have severely compounded the difficulties in any fundraise but FastForward remains committed to assisting the board of Factom wherever it can or to otherwise take what action it considers necessary to protect its position. Further updates will be provided as the situation evolves over the coming weeks.
>
> **FastForward Director, Ed McDermott, said,** "Factom has reached a critical juncture in its fundraising efforts where it has become clear that without action by FastForward to remove the impediment to investment created by the continued presence of the SAFE note, funding will not be forthcoming. These proposals are designed to remove this barrier whilst enabling FastForward to continue to benefit from the future development of Factom. It is disappointing that this will result in a book loss for

> FastForward, but we believe that this may, to a degree, have already been costed into our share price which continues to trade at a significant discount to net asset value and that this approach is necessary to retain some value in our investment in Factom. We will make further announcements as soon as practicable."

RNS No. 8454G (available at https://www.londonstockexchange.com/exchange/news/market-news/market-news-detail/FFWD/14469230.html).

> On April 2, 2020, FastForward issued a further release stating:
>
>> Further to the announcement of 19 March 2020, the Company has been notified by the directors of Factom that in a board meeting on 31 March 2020 they concluded that, in the absence of further funding, they now needed to begin the process of assignment of assets for the benefit of creditors.
>>
>> This action will be treated as a Dissolution Event under the terms of the [SAFE] and, as such, FastForward will become the largest creditor representing well over 90 per cent. of the creditors. As such FastForward shall control the receivership process and is currently seeking to appoint a receiver to take control of Factom's assets including all intellectual property ("IP") upon which the Factom Protocol operates (the "Receivership").
>>
>> The Company's interest in Factom was divided between Series Seed shares and the SAFE valued at £581,000 and £4,880,000 respectively as at 30 September 2019. In light of the Receivership it is likely that the Series Seed shares shall have no carrying value. Likewise the value of the SAFE will also need to be reviewed dependent on the outcome of the Receivership, the resulting value of the assets acquired and the ability to realise value out of them.
>>
>> As soon as a Receiver is appointed and the process and timetable is understood the Company will make further updates. In the meantime the Directors of FastForward are proactively working with previous Factom management in evaluating options to maximise any value for the assets and the IP.
>>
>> **FastForward Director, Ed McDermott, said,** "We are extremely disappointed with this news from Factom. In light of this Dissolution Event under the SAFE we are taking swift action to protect our position as best we can in the circumstances albeit the ability to generate any meaningful return is uncertain. As we go through the Receivership process and understand more of the events that led to this position our position as investors in Factom is expressly reserved."

RNS No. 4984I (available at https://www.londonstockexchange.com/exchange/news/market-news/market-news-detail/FFWD/14488273.html).

Both pronouncements were false in material respects. The Debtor was not and is not indebted to FastForward in any amount on account of the SAFE, as no Qualified Financing, Liquidity Event or Dissolution Event has occurred prior to the commencement of this chapter 11 case; nor does this chapter 11 <u>reorganization</u> case constitute a Dissolution Event.[5] The notion that the Debtor needed to commence an assignment proceeding, or that FastForward would control the alleged, resulting "receivership process" was pure fiction.

The Debtor has engaged with FastForward on this matter, but to no avail. FastForward's conduct affirmatively harmed the Debtor, by preventing it from raising additional capital needed to support continued operations. The resulting inability to raise capital has forced the Debtor to reduce its staff to just two officers—its Founder and CEO Paul Snow and its COO Jay Smith (although the Debtor continues to rely on contractors).

FastForward's conduct has further left the Debtor little choice but to seek to estimate its claim under the SAFE at $0, pursuant to Bankruptcy Code section 502(c). The Debtor believes estimation is required under section 502(c). FastForward's claim under each of Section 1(a), (b) and (c) of the SAFE is contingent and unliquidated; and further, failure to estimate would unduly delay administration of this chapter 11 case, as the Debtor would otherwise need to keep this case open for the sole purpose of waiting-and-seeing if a triggering event occurs, whereas it would otherwise close out the case once a plan is confirmed and the bar date expires, absent the filing of unanticipated, large proofs of claim.

The Debtor further believes estimation of the SAFE claim at $0 is warranted. As to Section 1(b)-(c), the Debtor has no intention of pursuing a change of control or IPO and none is on the horizon, and the purpose of this chapter 11 case is to avoid a Dissolution Event.

As to Section 1(a) (Qualified Financing), the subject claim should be estimated at $0 because its mere existence effectively precludes the Debtor from raising any capital, as is needed to trigger FastForward's right to consideration under Section 1(a). Consider the following hypothetical:

> Assume that an investor purchases 10% of the preferred float for $1 million, at a $10 million valuation, and that after the purchase the investor owns 100 preferred shares and there are 1,000 outstanding. As noted above, a Qualified Financing occurs if there is a "series of transactions" wherein the Debtor raises at least $3 million through debt financing or the issuance/sale of preferred stock. Thus, the investor takes on the risk that it may get diluted under the SAFE if the Debtor subsequently raises an additional $2 million,

---

[5] The definition of "Change of Control" (a Liquidity Event) includes "any reorganization" but specifically excludes reorganization transactions "in which the holders of voting securities of the Company outstanding immediately prior to such transaction or series of transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such surviving or resulting entity." This Plan does not propose to modify the voting power of holders of Interests in the Debtor.

6

even through debt financing. In that event the following would occur: under Section 1(a), the SAFE would convert "into the number of shares of … Preferred Stock equal to the Purchase Amount [$6 million] divided by the Discount Price [.75]," or preferred stock having a value of $8 million (80% of the total valuation). All of a sudden, the investor's position (10% of preferred float) is converted to 10% of the 20% balance of the preferred float; that is, 100 preferred shares having a value of $200,000, at a $10 million valuation.[6]

Respectfully, no reasonable investor would take on the risk of being diluted in this manner, which is why the SAFE has neutered the Debtor's ability to raise capital.[7]

And of course, if the Debtor cannot raise capital as a result of FastForward's contractual rights under Section 1(a), its contractual right to preferred stock under Section 1(a) in the event of a Qualified Financing is itself worthless, and is appropriately estimated at $0.

Estimation of FastForward's claims under the SAFE at $0 is also appropriate because it twice explicitly states that the parties' rights and obligations may be limited by the Bankruptcy Code. (SAFE §§ 3(b), 4(a).)

2. Lease Rejection

The Debtor leased office space in the Stonecliff Building, located at 7801 North Capital of Texas Highway, Austin, Texas 78731 (Suite 240), commencing December 1, 2018. The lease term runs through May 31, 2024, and so the Debtor has approximately four years left. Base rent is $9,818/month beginning July 1, 2020 and additional rent (common charges) is currently approximately $6,900/month. The Debtor no longer needs for the office space, which was used principally in connection with the its mortgage loan origination and servicing business segment which has since been wound down. The Debtor has moved to reject this lease, nunc pro tunc to the petition date, pursuant to Bankruptcy Code section 365. The Debtor vacated the premises prior to the petition date and so advised the landlord's management company.

---

[6] Note, that at a higher valuation the dilution may be more palatable. If the investor bought 10% of the preferred float, as in the example above, and the Debtor did a subsequent capital raise at a $20 million valuation that triggered application of Section 1(a), FastForward would only be entitled to preferred equity worth 40% of the preferred float ($8 million of $20 million), and the investor would own 10% of the 60% balance of the preferred float (preferred stock worth $1.2 million).

[7] Despite the fact that the Debtor has devoted significant time and resources towards raising capital for at least a year, and has cooperated with FastForward in connection with such efforts, the best the Debtor has been able to do insofar as capital raising efforts is concerned is a statement of intention to invest $500,000 contingent on this Court estimating FastForward's SAFE claim at $0. FastForward has acknowledged that the SAFE has severely impaired the Debtor's ability to raise capital. (RNS No. 8454G (first paragraph, quoted above).)

**D.      Liquidation Analysis**

Pursuant to Bankruptcy Code section 1129(a)(7), in order for this Plan to be confirmed, each creditor must either have voted to accept this Plan (or be deemed to have accepted this Plan), or this Plan must provide for each creditor to receive at least as much as it would as of the Effective Date if the Debtor were liquidated under Chapter 7 on such date.  Section 1129(a)(7) is satisfied because this Plan provides for holders of allowed general unsecured claims—the only class of claims eligible to vote on this Plan—to receive compound interest on their respective allowed claims at a rate greater than that provided under 28 U.S.C. § 1961(a), made applicable by Bankruptcy Code section 726(a)(5).  The Debtor also believes that if it were liquidated in chapter 7, the Debtor's platform and products would be nearly worthless without continued support from its management.

**E.      Ability to Make Future Plan Payments and Operate Without Further Reorganization**

In order for the Court to confirm this Plan, the Debtor must also demonstrate that it will have enough cash over the life of this Plan to make the payments required hereunder and operate the Debtor's business.  As noted above (Footnote 7, *supra*), the Debtor believes that it will be able to raise approximately $500,000 needed to satisfy projected operational costs associated with its DHS project, and subsequently generate sufficient free cash flow from earnings to pay its creditors in full, provided the SAFE claim is successfully discharged and the Debtor successfully puts to rest inter alia the false perception (resulting from FastForward's false statements) that a Dissolution Event has occurred under the SAFE and that the first $6 million of any further capital raise will be paid to FastForward rather than applied to operating costs.

**You should consult with your accountant or other financial advisor if you have any questions concerning the Debtor's projections.**

ARTICLE I
**DEFINITIONS AND RULES OF CONSTRUCTION**

**1.1      Definitions and Rules of Construction**

The definitions and rules of construction set forth in Bankruptcy Code sections 101-102 shall apply when terms defined or construed in the Bankruptcy Code are used herein, and they are supplemented by the following definitions:

"Claims Objection Deadline" shall have the meaning ascribed to it in Section 5.8 of this Plan.

"Disputed Claim" means a claim or any portion thereof that has not been allowed or disallowed by final non-appealable order, and as to which: (a) a proof of claim has been filed and (b) an objection has been or may be timely filed, and any such objection has not been withdrawn, resolved or overruled by final non-appealable order.

"Effective Date" means the first business day following entry of an Order confirming this Plan on which payments under this Plan commence, provided the fourteen day stay under Rule

3020(e) is waived by the Court; and if it is not waived, the first business day that is fourteen days following entry of such Order on which payments under this Plan commence.

"General Unsecured Claims" means all claims listed on the Debtor's Schedule E/F not marked disputed, contingent or unliquidated, and any proof of claim filed against the Debtor, except to the extent that they assert priority status under Bankruptcy Code section 507(a).

"Interests" means all interests in the Debtor as specified in the Debtor's list of equity security holders, filed pursuant to Rule 1007(a)(3).

"Trustee" means the trustee appointed in this chapter 11 case pursuant to Bankruptcy Code section 1183.

### 1.2   Computation of Time

The provisions of Rule 9006(a) shall apply in computing any period of time prescribed or allowed by this Plan.

## ARTICLE II
## TREATMENT OF UNCLASSIFIED CLAIMS

### 2.1   Administrative Expense Claims

Except to the extent that the holder of an allowed administrative expense claim agrees to less favorable treatment, each such holder will receive payment of its allowed claim in full in cash on the later of the Effective Date and the date on which such claim becomes allowed, or as soon as reasonably practicable thereafter.

### 2.2   Priority Tax Claims

Except to the extent that the holder of an allowed priority tax claim agrees to less favorable treatment, each such holder will receive (a) payment of its allowed claim in full in cash on the later of the Effective Date and the date on which such claim becomes allowed, or as soon as reasonably practicable thereafter; or (b) installment payments in accordance with Bankruptcy Code section 1129(a)(9)(C).

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### 3.1   Classification

The following table designates classes of claims and interests and specifies which classes are impaired or unimpaired and their voting status.

| Class | Designation | Status under Plan | Voting Status |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept |

| Class | Designation | Status under Plan | Voting Status |
|---|---|---|---|
| 2 | General Unsecured Claims | Impaired | Entitled to vote |
| 3 | Interests | Unimpaired | Deemed to accept |

**3.2    Treatment**

(a)    <u>Class 1—Priority Non-Tax Claims</u>

Except to the extent that the holder of an allowed priority non-tax claim agrees to less favorable treatment, each such holder will receive payment of its allowed claim in full in cash on the later of the Effective Date and the date on which such claim becomes allowed, or as soon as reasonably practicable thereafter.

(b)    <u>Class 2—General Unsecured Claims</u>

Except to the extent that the holder of an allowed General Unsecured Claim agrees to less favorable treatment, each such holder will receive payment of its allowed claim in full in cash, plus interest at the rate of 1%/year, compounded on the last business day of each calendar quarter, within three (3) years following the Effective Date.

(c)    <u>Class 3—Interests</u>

Upon the Effective Date, all holders of Interests in the Debtor shall retain such Interests.

**ARTICLE IV**
**MEANS FOR IMPLEMENTATION**

**4.1    Source of Cash for Payments to Creditors**

Payments to creditors under this Plan shall be made from the Debtor's earnings. In accordance with Bankruptcy Code section 1190(2), the Debtor shall submit its future earnings and other income to the supervision and control of the Trustee, but solely to the extent necessary to execute this Plan.

**4.2    Estimation of Claims**

FastForward's claim under the SAFE shall be estimated at $0 for all purposes, including for payment purposes, pursuant to Bankruptcy Code section 502(c).  Entry of an Order confirming this Plan shall constitute the Court's approval of such estimation.  The Debtor shall also have the right to seek estimation of any other contingent or unliquidated claim, pursuant to section 502(c).

**4.3    Directors and Officers**

Upon the Effective Date, the Debtor's prepetition directors, all identified in the unanimous written consent annexed to the Debtor's voluntary petition for relief, shall remain on the board,

and shall serve without compensation, save reimbursement of their respective expenses, and Paul Snow and Jay Smith shall remain the Debtor's officers, and upon the Effective Date each shall be paid not more than $15,000/month plus reimbursement of their respective expenses, in each case until such time as allowed claims under this Plan have been satisfied.

**4.4    Preservation of Causes of Action**

Any cause of action belonging to the Debtor's estate prior to the Effective Date shall vest in the Debtor on such date, including for the avoidance of doubt all causes of action arising from any statement made by FastForward concerning the SAFE or its rights thereunder (including those statements quoted above and including causes of action for tortious interference, injurious falsehood and defamation).

**4.5    Setoff**

Upon the Effective Date, the Debtor may, to the extent permitted by Bankruptcy Code section 558 or applicable non-bankruptcy law, set off or recoup from any claim on which payments are to be made, any cause of action that the Debtor may have against the holder of such claim.

## ARTICLE V
## PROVISIONS GOVERNING PAYMENTS

**5.1    Debtor to Make Payments**

The Debtor shall make all payments required by this Plan, whether confirmed under Bankruptcy Code section 1191(a) or (b).  Upon the Effective Date, all payments or funds received by the Trustee, if any, during this chapter 11 case shall be returned to the Debtor after deducting any fee owed to the Trustee.

**5.2    Delivery of Payments**

Payments required by this Plan shall be made by check mailed to the address set forth in any proof of claim; to the address set forth in any written notice of address change filed with the Court or provided to the Debtor or its counsel; or to the address set forth in the Debtors' schedules if no proof of claim has been filed and no written notice of address change has been filed or provided.

**5.3    Time Bar to Cash Payments**

Checks issued by the Debtor on account of allowed claims shall be null and void if not negotiated within sixty (60) days after issuance.  After expiration of such period, the creditor's payment shall irrevocably revert to the Debtor free and clear of any restrictions.

**5.4    No Interest**

Unless otherwise specifically provided for in this Plan, postpetition interest shall not accrue or be paid on any claim.

**5.5**   **Disputed Claims Reserve**

The Debtor shall establish a reserve for the payment of any Disputed Claim, to the extent such claim becomes allowed.  The amount set aside in the reserve for any Disputed Claim shall be the amount that would be paid on account of such claim if allowed in the lower of: (a) the amount set forth in the applicable proof of claim and (b) the estimated amount of such claim for payment purposes, as determined by the Court.

**5.6**   **No Payments on Disputed Claims**

No payment will be made on account of a Disputed Claim unless such claim has been allowed by final non-appealable order.

**5.7**   **Resolution of Disputed Claims**

The Debtor shall have the authority to settle and resolve any Disputed Claim on such terms as it deems appropriate without the need for Court approval.

**5.8**   **Claims Objection Deadline**

The Debtor shall have until one hundred and eighty (180) days following the Effective Date ("Claims Objection Deadline") to file objections to any Disputed Claim.  The Claims Objection Deadline may be extended on motion of the Debtor for cause, or on consent.  Any proofs of claim not objected to within the Claims Objection Deadline or resolved pursuant to Section 5.7 of this Plan shall be deemed allowed.

**5.9**   **Withholding Taxes**

The Debtor shall be entitled to deduct any Federal, state or local withholding taxes from any payments made under this Plan.  As a condition to making any such payment, the Debtor may require that the holder of an allowed claim provide its Taxpayer Identification Number and such other information and certification as may be deemed necessary for it to comply with applicable tax reporting and withholding laws.  Failure to provide such number, information or certification may result in forfeiture of such holder's right to payment on account of its claim.

## ARTICLE VI
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**6.1**   **Assumption/Rejection of Executory Contracts and Unexpired Leases**

The Debtor will be conclusively deemed to have rejected all of its executory contracts and unexpired leases as of the Effective Date, to the extent not previously assumed, assumed and assigned or rejected.

**6.2**   **Rejection Damages Claims**

Proofs of claim arising from the rejection of any executory contract or unexpired lease pursuant to this Plan must be filed with the Court within thirty (30) days following the Effective

Date.  All rejection damages claims filed after such date shall be deemed disallowed, without the need to file a formal objection pursuant to Bankruptcy Code section 502(b) and Rule 3007.

## ARTICLE VII
## DISCHARGE, RELEASE AND INJUNCTION

**7.1     Discharge**

If this Plan is confirmed under Bankruptcy Code section 1191(a), the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in Bankruptcy Code section 1141(d)(1)(A), except that the Debtor will not be discharged of any debt imposed by this Plan or to the extent provided in section 1141(d)(6).

If this Plan is confirmed under section 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan unless the Court grants a discharge on completion of all payments due within the first three (3) years of this Plan, or as otherwise provided in Bankruptcy Code section 1192.  The Debtor will not be discharged from any debt on which the last payment is due after the first three (3) years of the Plan, or as otherwise provided in section 1192.

**7.2     Release**

From and after the Effective Date, none of the Debtor's directors, officers or attorneys shall have or incur any liability to the Debtor for any act or omission occurring between the commencement of this chapter 11 case and the Effective Date relating to this chapter 11 case, except for such acts or omissions that amount to fraud, gross negligence or willful misconduct, as determined by final non-appealable order.

**7.3     Injunction**

**From and after the Effective Date, FastForward shall be permanently enjoined from commencing or continuing any action against the Debtor or asserting or effecting any right of setoff or subrogation premised on the SAFE.**

## ARTICLE VIII
## MISCELLANEOUS

**8.1     Severability**

If any provision of this Plan is determined to be unenforceable, the determination will not limit or affect the enforceability or operative effect of any other provision.

**8.2     Binding Effect**

The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of its successors and assigns.

13

**8.3** **Captions**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**8.4** **Governing Law**

Unless a rule of law or procedure is supplied by Federal law, the laws of the State of Delaware govern this Plan and any agreements, documents or instruments executed in connection therewith, except as otherwise provided herein.

[Remainder of Page Left Blank]

Dated: June 18, 2020                              Respectfully submitted,

                                                             FACTOM, INC.

                                                             _____
                                                             Paul Snow, CEO