**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FACTOM, INC., [1] | Case No. 20-11602 (BLS) |
| Debtor. | |

## AMENDED CHAPTER 11 PLAN OF REORGANIZATION
### (SUBCHAPTER V)

Dated: July 15, 2020

Julia Klein (DE 5198)
KLEIN LLC
919 North Market Street, Suite 600
Wilmington, Delaware 19801
(302) 438-0456
klein@kleinllc.com

- and -

Jeffrey Chubak (pro hac vice)
AMINI LLC
131 West 35th Street, 12th Floor
New York, New York 10001
(212) 490-4700
jchubak@aminillc.com
*Attorneys for the Debtor*

---

[1] The Debtor's mailing address is 13492 Research Boulevard, P.O. Box 643, Austin, Texas 78750. The last 4 digits of its taxpayer identification number are 6915.

## TABLE OF CONTENTS

**Page**

BACKGROUND ................................................................................................................. 1

A.    Description and History of the Debtor's Business............................................. 1

    1.    The Platform ............................................................................ 1

    2.    The Debtor's Business Prospects.............................................. 1

B.    Capital Structure ............................................................................................ 3

C.    Reasons for this Chapter 11 Case ................................................................... 3

    1.    Estimation of SAFE Claim at $0 ............................................. 3

    2.    Lease Rejection......................................................................... 11

D.    Liquidation Analysis....................................................................................... 11

E.    Ability to Make Future Plan Payments and Operate Without Further Reorganization .... 11

ARTICLE I DEFINITIONS AND RULES OF CONSTRUCTION ........................................... 12

1.1    Definitions and Rules of Construction............................................................. 12

1.2    Computation of Time ...................................................................................... 13

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS .................................................. 13

2.1    Administrative Expense Claims........................................................................ 13

2.2    Priority Tax Claims......................................................................................... 13

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...... 13

3.1    Classification................................................................................................... 13

3.2    Treatment ........................................................................................................ 14

    (a)    Class 1—Priority Non-Tax Claims........................................... 14

    (b)    Class 2—General Unsecured Claims......................................... 14

    (c)    Class 3—Interests..................................................................... 14

ARTICLE IV MEANS FOR IMPLEMENTATION ................................................................ 14

4.1    Source of Cash for Payments to Creditors....................................................... 14

4.2    Estimation of Claims....................................................................................... 14

4.3    Directors and Officers..................................................................................... 14

4.4    Preservation of Causes of Action..................................................................... 15

4.5    Setoff.............................................................................................................. 15

ARTICLE V PROVISIONS GOVERNING PAYMENTS........................................................ 15

5.1    Debtor to Make Payments............................................................................... 15

5.2    Delivery of Payments ..................................................................................... 15

5.3    Time Bar to Cash Payments ........................................................................... 15

5.4    No Interest ..................................................................................................... 15

5.5    Disputed Claims Reserve .............................................................................. 16

5.6    No Payments on Disputed Claims ................................................................. 16

5.7    Resolution of Disputed Claims ...................................................................... 16

5.8    Claims Objection Deadline ............................................................................ 16

5.9    Withholding Taxes ......................................................................................... 16

ARTICLE VI EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................... 16

6.1    Assumption/Rejection of Executory Contracts and Unexpired Leases .......... 16

6.2    Rejection Damages Claims ............................................................................ 16

ARTICLE VII DISCHARGE, RELEASE AND INJUNCTION ................................................ 17

7.1    Discharge ....................................................................................................... 17

7.2    Release ........................................................................................................... 17

7.3    Injunction ....................................................................................................... 17

ARTICLE VIII MISCELLANEOUS ....................................................................................... 17

8.1    Severability .................................................................................................... 17

8.2    Binding Effect ................................................................................................ 17

8.3    Captions ......................................................................................................... 18

8.4    Governing Law ............................................................................................... 18

# BACKGROUND

**A.    Description and History of the Debtor's Business**

### 1.    The Platform

The Debtor is a corporation organized under Delaware law in 2014.  In the years following its formation, the Debtor worked towards developing a platform that permits entities to maintain a time-stamped record of data that is permanently recorded on blockchain,[1] without the need for cryptocurrency exposure or costly infrastructure.  The platform is now fully developed, and the Debtor offers two products that provide access to it.[2]

The initial, principal focus of the Debtor's business was adapting the platform for use in connection with the mortgage origination and servicing process, so as to reduce costs associated with reviews, audits, servicing transfers and underwriting submissions through reduced time and increased accuracy of file and digital asset assembly.  Prior to the commencement of this case, the Debtor wound down that business segment.

The Debtor's current principal focus is adapting the platform for use by the Department of Homeland Security ("DHS") and other Federal agencies, as discussed below.

### 2.    The Debtor's Business Prospects

To the Debtor's knowledge, it is the first participant in the DHS Science and Technology Directorate, Silicon Valley Innovation Program ("SVIP") which is intended to provide funding for projects that deploy technology to solve problems faced by DHS and its sub-agencies.  Under the program, companies are provided a series of grants totaling up to $800,000 to develop and test technologies.  The Debtor previously won five grants totaling nearly $1.2 million.  Further information about the SVIP can be found at: https://www.dhs.gov/science-and-technology/svip.

The Debtor's first project was undertaken on behalf of the United States Customs and Border Protection agency ("CPB") and concerns the use of blockchain to secure data from sensors (principally cameras) located along the United States-Mexico border.  The Debtor has successfully completed all four phases of the project.  DHS has highlighted the Debtor's project on its website.  E.g., https://www.dhs.gov/science-and-technology/blockchain-portfolio.

---

[1] Blockchain is a public ledger, used to record transactions in a verifiable and permanent way. Blockchain was first used as the public transaction ledger for Bitcoin.

[2] The two products are Harmony Connect and Harmony Integrate.  Harmony Connect allows users to add blockchain capabilities to their systems as well as sophisticated digital identities and credentialing; however, it does not include implementation of the many digital identity implementations potentially available (although it can support any).  Harmony Integrate provides pre-built implementation of the W3C standard for digital identities and credentials fully implemented and tested on the Factom protocol on which the Debtor's platform operates.

Successful completion of the four phases constitutes competitive procurement under the Competition in Contracting Act, and the Federal Acquisition Regulations promulgated thereunder, and, as a result, the Debtor can sell up to $10 million of the resulting technology without going through a separate competitive bidding process.

Because the project was one of the first to be undertaken through the SVIP, certain aspects of the program had not been finalized; and as a result, the Debtor was not advised until after the fact that the technology developed needed to be packaged within a management, provisioning and deployment platform before it could be used within the CPB environment. Still, DHS liked the Debtor's technology and suggested that the Debtor find a partner to provide the needed management platform and then revert to DHS. The Debtor has found a partner with the required technology (Signal Garden) and they together have met with DHS to present a combined solution. The proposed, combined solution met with preliminary DHS approval and the Debtor and Signal Garden were asked to create a working demonstration. The working demonstration has been created and presented to the SVIP office, where it was positively received. The Debtor is presently working with the SVIP office to schedule a demonstration for CBP. Upon making a successful demonstration, the Debtor anticipates going into procurement and contract negotiations which the Debtor anticipates taking 90-120 days.

If the subject technology is implemented along the United States-Mexico border, the Debtor expects the subject contract to be profitable. The Debtor projects generating $100,000-$200,000 in revenue in the form of engineering and consulting fees in its first year. Once the technological solution has been fully implemented the Debtor projects generating roughly $3 million/year in recurring "software as a service" revenue, given inter alia that the Debtor charges for the subject product based on its usage, the length of the border and the anticipated thousands of sensors that would be recording data.

In addition, DHS recently issued a new SVIP call with five different subject areas. As part of the Debtor's fifth SVIP contract with DHS, the Debtor has developed digital identity and verifiable credential technology based on the W3C standard that is required for all submissions to the current call. Of the seven companies participating in this SVIP call, the Debtor was one of only three able to fully pass DHS's compatibility tests.

Four partner companies have turned in submissions to this SVIP call using the Debtor's technology on a revenue sharing basis using the various subject areas. The Debtor anticipates receiving 35%-40% of the approximately $800,000 in revenue each complete program will generate. Furthermore, the resulting solutions will use the Debtor's "software as a service" solution generating ongoing, recurring revenue. The proposals submitted include solutions addressing supply chain problems, alternate identifiers for social security and identification technology for essential workers. The broad range of subject areas addressed demonstrates the broad applicability of the Debtor's technology.

In addition to working with DHS, the Debtor is a subcontractor on a project commissioned by the Department of Energy ("DOE") to protect the United States' electric grid from cyber-attack using blockchain technology. As is described in the final report for the first phase of the project, the Debtor developed a prototype demonstrating a proprietary "Validator/Accumulator" architecture for a private or hybrid private/public blockchain that organizes data on a blockchain

that can be distributed over the electric grid.  This architecture can handle millions of transactions per second, covering multiple applications and use cases, and do so on relatively standard computer architectures.  In addition to high transaction rates, the architecture allows specification of service levels, as data is collected, condensed, and pruned over time, keeping hardware requirements modest while delivering true blockchain security to the electric grid. The Debtor was awarded $57,000 in connection with the project's first phase.

The Debtor further anticipates the project's second phase, which will develop the above beyond prototype level, will result in commercially interesting technology which the Debtor will be able to sell to companies in the electricity generation and distribution industry. The Debtor anticipates generating revenues of $125,000 in the second phase.

The Debtor, in partnership with the University of North Texas, has also applied for a $100,000 grant in connection with a Department of Transportation project concerning application of blockchain technology to traffic control.

**B.    Capital Structure**

The Debtor believes it has approximately $350,000 in debt, as described in its Schedule D and Schedule E/F, filed June 19, 2020, excluding lease rejection damages (discussed below) and approximately $60,000 owed under a D&O insurance premium financing agreement as to which it has requested authorization to pay, and assuming the claim of FastForward Innovations Limited ("FastForward") (discussed below) is estimated at $0 as proposed herein.  Of the unsecured debt, $183,677 is attributable to a PPP loan under the CARES Act that may be forgiven in whole or in part.   The deadline for filing proofs of claim is August 17, 2020, for all persons other than governmental units; and December 15, 2020 for governmental units [D.I. 20].

The Debtor has issued several classes of equity securities, ownership of which is as set forth in its list of equity security holders, filed pursuant to Rule 1007(a)(3).  Copies of the Debtors' schedules [D.I. 5] and list of equity security holders [D.I. 29] shall be provided on request.

**C.    Reasons for this Chapter 11 Case**

1.    Estimation of SAFE Claim at $0

From 2015-17, the Debtor raised over $10 million from investors that included renowned venture capitalists Tim Draper of Draper Associates, Kuala Innovations, Harvest Equity and Peeli Ventures.[3]

---

[3] In 2015-2016, the Debtor raised $400,000 at an $11 million valuation.  In 2017, the Debtor raised an additional $8 million Series A at a $38 million post-money valuation as part of an extended Series A round.  Holders of all Interests (defined below) in the Debtor are set forth in the Debtor's list of equity security holders.

The Debtor raised an additional $6 million pursuant to a Simple Agreement for Future Equity it entered into with FastForward, dated as of July 20, 2018 (as amended, the "SAFE"), a copy of which has been filed [D.I. 6] and shall be provided on request.

The Debtor used capital raised by it from 2015-18 in order to inter alia pay its engineering team to build the subject platform and develop additional product features, build the Debtor's proprietary patent pool, develop a marketing and sales team, invest in tooling needed to minimize back-office overhead and cover other operating costs such as rent, utilities and insurance.

FastForward has three contingent and unliquidated claims under the SAFE.

(1) Pursuant to Section 1(a) of the SAFE, FastForward has a contractual right to preferred stock if the Debtor consummates a "Qualified Financing," defined broadly as "any financing raised in [a] bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed money valuation and/or financing raised in any Qualified Fundraising Activity, which collectively have an aggregate sales price of not less than $3,000,000." The term "Qualified Fundraising Activity" in turn "means any combination of convertible notes, other Safes, any other convertible security agreement and/or debt financing."

(2) Pursuant to Section 1(b), FastForward has a contractual right to common stock, repayment in cash of the above-referenced $6 million, or a combination of cash and common stock in the event of a "Liquidity Event," defined as a change of control or IPO; and

(3) Pursuant to Section 1(c), FastForward has a contractual right to repayment in cash of the above-referenced $6 million in the event of a "Dissolution Event," defined as "(i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (excluding a Liquidity Event), whether voluntary or involuntary."

For at least a year, the Debtor has undertaken to raise additional capital; however, it was unable to do so prior to the commencement of this chapter 11 case, principally due to the terms of Section 1(a) of the SAFE.  Consider the following hypothetical:

Assume an investor purchases 10% of the preferred float for $1 million, at a $10 million valuation, and that after the purchase the investor owns 100 preferred shares and there are 1,000 outstanding. As noted above, a Qualified Financing occurs if there is a "series of transactions" wherein the Debtor raises at least $3 million through debt financing or the issuance/sale of preferred stock.  Thus, the investor takes on the risk that it may get diluted under the SAFE if the Debtor subsequently raises an additional $2 million, even through debt financing.  In that event the following would occur: under Section 1(a), the SAFE would convert "into the number of shares of … Preferred Stock equal to the Purchase Amount [$6

4

million] divided by the Discount Price [.75]," or preferred stock having a value of $8 million (80% of the total valuation). All of a sudden, the investor's position (10% of preferred float) is converted to 10% of the 20% balance of the preferred float; that is, 100 preferred shares having a value of $200,000, at a $10 million valuation.[4]

Respectfully, no reasonable investor would take on the risk of being diluted in this manner, which is why the SAFE has neutered the Debtor's ability to raise capital. Indeed, in e-mail correspondence from FastForward' counsel, Michael Corcoran of the British international commercial law firm Hill Dickinson, to the Debtor's COO Jay Smith, transmitted March 18, 2020, Mr. Corcoran expressly referred to the SAFE as being "a poison pill." Further, as is described below, FastForward has acknowledged that the SAFE has severely impaired the Debtor's ability to raise capital. (RNS No. 8454G (first paragraph, quoted below).)

On March 19, 2020, in an effort to raise capital, the Debtor's Founder and CEO Paul Snow, wrote to the Debtor's investors as follows:

Subject: Factom's stark options

Factom investors,

Factom faces two stark realities. On the one hand we have over $10M in very real opportunities but on the other hand we are going to run out of capital before we can capitalize on the opportunities resulting in the opportunities and IP reverting to our note holder.[5]

We have been forced into negotiating funding at a much reduced valuation. We are giving current investors the opportunity to enter into a convertible note to take an attractive position in new funding. These efforts will be helped by a number of factors.

---

[4] Note, that at a higher valuation the dilution may be more palatable. If the investor bought 10% of the preferred float, as in the example above, and the Debtor did a subsequent capital raise at a $20 million valuation that triggered application of Section 1(a), FastForward would only be entitled to preferred equity worth 40% of the preferred float ($8 million of $20 million), and the investor would own 10% of the 60% balance of the preferred float (preferred stock worth $1.2 million). However, the Debtor's projected business activities do not warrant such a valuation.

[5] Mr. Snow's description of FastForward as a "noteholder" on account of the SAFE is, of course, incorrect. As described above, FastForward's contractual rights under the SAFE give rise only to contingent and unliquidated claims. Indeed, his subsequent e-mail states that the "SAFE note" will not "convert to a debt of 6 million dollars" until the Debtor has commenced a liquidation proceeding.

- In the last financial crisis, interest in securing business processes was very high, leading to high interest in Factom in 2014-2015.

- We expect government contracting to be expanded, particularly in securing IoT and Supply Chain applications.

- Factom has done work in both areas and is currently working with CBP on a supply chain contract.

- **FFWD has indicated a willingness to negotiate the SAFE note, removing a major barrier to financing.**

- We have been in discussions with three different groups for funding, but these opportunities require 3 to 6 months to finalize.

We reduced out staff in May of 2019 to focus on our OHS and government contracting opportunities, as well as enhancing Factom IP.

- We successfully completed the fourth phase of the DHS SVIP loT security effort.

- We won a DHS (Customs and Border Protection) SVIP contract to demonstrate application of our W3C compliant identity solutions for supply chain security of responsibly harvested timber. (With another $600K in follow on contracts available)

- We continue to support TFA's SBIR grant to use Factom to secure the Electric Grid by using TFA's "Signed at Source" (SAS) technology to secure sensors and IoT devices that monitor the electric grid

- Factom now has 3 issued patents and 2 more approved patents on fundamental data management on the blockchain, as well as another 24 patents pending. One of our patents has already blocked a Capital One patent.

At the end of March, without any additional support or funding, Factom Inc. will be forced to enter discussions with creditors about the distribution of Factom's assets. When that happens, the FFWD SAFE note becomes a debt of six million dollars, greatly exceeding any evaluation of Factom Inc.'s assets.

At that point, we may also have an opportunity to negotiate a restructuring of Factom Inc., but FFWD would at that time hold all the equity in Factom Inc.

Letting everything default into the our note holder's hands is an outcome we have been working very hard to avoid because of the impact this outcome would have on our investors. We've done all we can do and have

stretched resources out as far as possible, farther than we originally thought we could but we are near the end and without some help a default is imminent.

We need a group of our existing investors to pool a small set of resources to give us the runway to bring you the opportunities we all believed existed when you invested in Factom in the first place.

Reach out. We can offer very favorable terms for help getting us down this final mile.

On the same date, FastForward issued a press release through the London Stock Exchange's Regulatory News Service ("RNS") stating:

It has become clear that the Company's [FastForward's] SAFE is seen by investors as an impediment to further investment in Factom, despite continued interest being expressed by multiple parties in the event that this barrier can be removed …

Factom remains actively involved in negotiations with two industry parties but has notified shareholders that at the end of March 2020, without any additional support or funding, Factom Inc. will be forced to enter discussions with creditors about the distribution of its assets.  At this point, the SAFE becomes a debt of $6 million and the Company will be the largest creditor. The Company has held preliminary discussions with management regarding a potential restructuring of Factom and its creditors, but any deal requires fresh investment in Factom by existing and new investors. The Company has indicated that as part of a syndicate it may provide further funding to Factom but will not lead the fundraise on its own.

In any scenario, based on the proposals FastForward is aware of, it is highly likely that there will be a very significant impairment to the value of the Company's investment in Factom. The impact on the carrying value will depend on the result of discussions as part of any fundraise. At the very least it is the Directors' belief that any realization of the investment in its entirety will be delayed for the foreseeable future.

The current global financial markets uncertainty caused by the Covid-19 outbreak have severely compounded the difficulties in any fundraise but FastForward remains committed to assisting the board of Factom wherever it can or to otherwise take what action it considers necessary to protect its position. Further updates will be provided as the situation evolves over the coming weeks.

**FastForward Director, Ed McDermott, said, "**Factom has reached a critical juncture in its fundraising efforts where it has become clear that without action by FastForward to remove the impediment to investment created by the continued presence of the SAFE note, funding will not be

forthcoming. These proposals are designed to remove this barrier whilst enabling FastForward to continue to benefit from the future development of Factom. It is disappointing that this will result in a book loss for FastForward, but we believe that this may, to a degree, have already been costed into our share price which continues to trade at a significant discount to net asset value and that this approach is necessary to retain some value in our investment in Factom. We will make further announcements as soon as practicable."

RNS No. 8454G (available at https://www.londonstockexchange.com/exchange/news/market-news/market-news-detail/FFWD/14469230.html).

On April 1, 2020, the Mr. Snow again wrote to the Debtor's investors as follows:

Subject: Factom is about to go into receivership

Investors,

We have come to the point that we don't have the resources to continue operations.

As communicated to you on March 19, 2020, our options are limited. One of those options we discussed was a call for current investors to step up and provide the funds necessary for Factom to operate over the next three or four months for our OHS opportunities to be realized.

Over the last few months, we have been in deep discussions for Investment from various parties. With FFWD's recent stated willingness to address the SAFE note issue, we have had some promise of securing the needed resources.

For many reasons, not the least is the vast impact of the covid-19 pandemic on the economy, funding has not materialized.

I called a board meeting on March 31, 2020 where we discussed the situation. While we came to the conclusion that we need to set the process in motion for an assignment of assets for the benefit of creditors. We did not have Harry Qin of Peeli Ventures in attendance (who represents the Series A Investors) so the formal vote will be held when we get Harry Qin or a proxy to attend, likely tomorrow.

Once approved by the board, this resolution will go out to our shareholders for approval, which will be necessary for an orderly winding down of Factom.

The FFWD SAFE note will convert to a debt of 6 million dollars, and will represent well over 90% of the value held by creditors, so they will act as the Receiver.

Please feel free to contact David [Johnston, chairman of the board] or me if you have any questions.

On April 2, 2020, at 5:54 a.m. (Greenwich Mean) (April 1, 2020, 11:54 p.m. Central), FastForward, through Mr. Corcoran, e-mailed Mr. Smith inquiring "who should the FFWD Lawyer liaise with to complete the Assignment for the Benefit of Creditors?" Mr. Smith responded as follows the next morning, at 10:41 a.m. (Central):

Michael,

Just to make sure we are both on the same page with respect to the required process.

There must be a vote of the shareholders with more than 50% of the shares approving before we can do an assignment.

This was the point of the last email to the shareholders, to start campaigning to get them to approve the assignment.

On April 2, 2020, at 7:00 p.m. (Greenwich Mean) (1:00 p.m. Central), FastForward issued a further release stating:

Further to the announcement of 19 March 2020, the Company has been notified by the directors of Factom that in a board meeting on 31 March 2020 they concluded that, in the absence of further funding, they now needed to begin the process of assignment of assets for the benefit of creditors.

This action will be treated as a Dissolution Event under the terms of the [SAFE] and, as such, FastForward will become the largest creditor representing well over 90 per cent. of the creditors. As such FastForward shall control the receivership process and is currently seeking to appoint a receiver to take control of Factom's assets including all intellectual property ("IP") upon which the Factom Protocol operates (the "Receivership").

The Company's interest in Factom was divided between Series Seed shares and the SAFE valued at £581,000 and £4,880,000 respectively as at 30 September 2019. In light of the Receivership it is likely that the Series Seed shares shall have no carrying value. Likewise the value of the SAFE will also need to be reviewed dependent on the outcome of the Receivership, the resulting value of the assets acquired and the ability to realise value out of them.

As soon as a Receiver is appointed and the process and timetable is understood the Company will make further updates. In the meantime the Directors of FastForward are proactively working with previous Factom management in evaluating options to maximise any value for the assets and the IP.

> **FastForward Director, Ed McDermott, said, "**We are extremely disappointed with this news from Factom. In light of this Dissolution Event under the SAFE we are taking swift action to protect our position as best we can in the circumstances albeit the ability to generate any meaningful return is uncertain. As we go through the Receivership process and understand more of the events that led to this position our position as investors in Factom is expressly reserved."

RNS No. 4984I (available at https://www.londonstockexchange.com/exchange/news/market-news/market-news-detail/FFWD/14488273.html).

The pronouncement that a Dissolution Event had occurred, and that as a result, FastForward had become the Debtor's largest creditor, was false.  Indeed, the April 2, 2020 release acknowledged that no receiver had been appointed, and Mr. Smith had advised FastForward hours prior that a shareholder vote was needed before the subject, then-contemplated insolvency proceeding could even be commenced.[6]

The Debtor has engaged with FastForward on this matter, but to no avail.  The Debtor's inability to raise capital prepetition has forced the Debtor to reduce its staff to just two officers, Messrs. Snow and Smith, although the Debtor continues to rely on contractors.

FastForward's conduct has left the Debtor little choice but to seek to estimate its claim under the SAFE at $0, pursuant to Bankruptcy Code section 502(c).  The Debtor believes estimation is required under section 502(c), because its claim under each of Section 1(a), (b) and (c) of the SAFE is contingent and unliquidated; and further, failure to estimate would unduly delay administration of this chapter 11 case, as absent estimation the Debtor would need to keep this case open for the sole purpose of waiting-and-seeing if a triggering event occurs, whereas it would otherwise close out the case once a plan is confirmed and the bar date expires, absent the filing of unanticipated, large proofs of claim.

The Debtor further believes estimation of the SAFE claim at $0 is warranted.  As to Section 1(b)-(c), the Debtor has no intention of pursuing a change of control (as defined in the SAFE) or IPO and none is on the horizon, and the purpose of this chapter 11 case is to avoid a Dissolution Event.  As to Section 1(a) (Qualified Financing), the subject claim should be estimated at $0 because its mere existence effectively precludes the Debtor from raising capital from any investor save perhaps FastForward, as is needed to trigger FastForward's right to consideration under Section 1(a), as noted above. As to FastForward, it declined to invest when invited to do so pre-

---

[6] It is undisputed, that the commencement of this chapter 11 reorganization case does not constitute a Dissolution Event.  The definition of "Change of Control" (a Liquidity Event) includes "any reorganization" but specifically excludes reorganization transactions "in which the holders of voting securities of the Company outstanding immediately prior to such transaction or series of transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such surviving or resulting entity."  This Plan does not propose to modify the voting power of holders of Interests in the Debtor.

bankruptcy; and when Mr. Snow reached out again to Lorne Abony, the signatory to the SAFE, post-bankruptcy, on June 20, 2020, about participating in a capital raise, Mr. Abony responded two days alter with vitriol, fraud accusations and threats of criminal charges.  Of course, if the Debtor cannot raise capital as a result of FastForward's contractual rights under Section 1(a) from FastForward or anyone else, the contractual right to preferred stock under Section 1(a) in the event of a Qualified Financing is itself worthless and is appropriately estimated at $0.  Estimation of FastForward's claims under the SAFE at $0 is also appropriate because it twice explicitly states that the parties' rights and obligations may be limited by the Bankruptcy Code.  (SAFE §§ 3(b), 4(a).)

      2.    <u>Lease Rejection</u>

The Debtor leased office space in the Stonecliff Building, located at 7801 North Capital of Texas Highway, Austin, Texas 78731 (Suite 240), commencing December 1, 2018.  The lease term runs through May 31, 2024, and so the Debtor had approximately four years left as of the commencement of this case.  Base rent was $9,818/month beginning July 1, 2020 and additional rent (common charges) was approximately $6,900/month.  As the Debtor no longer needs the office space, which was used principally in connection with the its mortgage loan origination and servicing business segment which has since been wound down, the Debtor moved to reject this lease nunc pro tunc to the petition date, pursuant to Bankruptcy Code section 365.  The Court entered an order granting said relief on July 13, 2020 [D.I. 53].

**D.**    **Liquidation Analysis**

Pursuant to Bankruptcy Code section 1129(a)(7), in order for this Plan to be confirmed, each creditor must either have voted to accept this Plan (or be deemed to have accepted this Plan), or this Plan must provide for each creditor to receive at least as much as it would as of the Effective Date if the Debtor were liquidated under Chapter 7 on such date.  Section 1129(a)(7) is satisfied because this Plan provides for holders of allowed general unsecured claims—the only class of claims eligible to vote on this Plan—to receive compound interest on their respective allowed claims at a rate greater than that provided under 28 U.S.C. § 1961(a), made applicable by Bankruptcy Code section 726(a)(5).  The Debtor also believes that if it were liquidated in chapter 7, the Debtor's platform and products would be nearly worthless without continued support from its management.

**E.**    **Ability to Make Future Plan Payments and Operate Without Further Reorganization**

In order for the Court to confirm this Plan, the Debtor must also demonstrate that it will have enough cash over the life of this Plan to make the payments required hereunder and operate the Debtor's business.

The Debtor is in advanced stages of negotiations with two investors who have completed due diligence and have expressed very strong interest in investing in the Debtor's business and technology, subject to FastForward's claims under the SAFE being fully liquidated in bankruptcy as provided herein and the Debtor emerging from bankruptcy.  The Debtor expects the prospective investors to collectively contribute not less than $1 million in its initial, post-reorganization investment round.  One of the above-referenced investors is deeply connected to a $1 billion

research lab ("Lab") that has access to a large pool of government research grants.  The Debtor has had discussions with the Lab's senior management and the feedback has been, that the Debtor's technology would likely add significant value to the Lab's blockchain projects and that there exists the potential for significant source of recurring "software as a service" and engineering revenue for the Debtor.  Thus, provided the Debtor successfully liquidates FastForward's claim, the Debtor anticipates generating revenue from these contracts by the first quarter of 2021.

The Debtor anticipates it will be in a position to furnish evidence of committed financing, again, subject to FastForward's claims under the SAFE being fully liquidated in bankruptcy as provided herein and the Debtor emerging from bankruptcy, in advance of the confirmation hearing.

Based on the above-described anticipated contracts, the Debtor projects achieving operational solvency in four to six months, and thereafter remaining profitable.  The Debtor's current business projections are annexed hereto as Schedule 1.  The Debtor further believes that there exist significant opportunities well beyond those described above.  For example, the Covid-19 pandemic has presented new opportunities as serious supply chain challenges have been brought to light that can be addressed by the Debtor's technology.

**You should consult with your accountant or other financial advisor if you have any questions concerning the Debtor's projections.**

### ARTICLE I
### DEFINITIONS AND RULES OF CONSTRUCTION

**1.1    Definitions and Rules of Construction**

The definitions and rules of construction set forth in Bankruptcy Code sections 101-102 shall apply when terms defined or construed in the Bankruptcy Code are used herein, and they are supplemented by the following definitions:

"Claims Objection Deadline" shall have the meaning ascribed to it in Section 5.8 of this Plan.

"Disputed Claim" means a claim or any portion thereof that has not been allowed or disallowed by final non-appealable order, and as to which: (a) a proof of claim has been filed and (b) an objection has been or may be timely filed, and any such objection has not been withdrawn, resolved or overruled by final non-appealable order.

"Effective Date" means the first business day following entry of an Order confirming this Plan on which payments under this Plan commence, provided the fourteen day stay under Rule 3020(e) is waived by the Court; and if it is not waived, the first business day that is fourteen days following entry of such Order on which payments under this Plan commence.

"General Unsecured Claims" means all claims listed on the Debtor's Schedule E/F not marked disputed, contingent or unliquidated, and any proof of claim filed against the Debtor, except to the extent that they assert priority status under Bankruptcy Code section 507(a).

12

"Interests" means all interests in the Debtor as specified in the Debtor's list of equity security holders, filed pursuant to Rule 1007(a)(3).

"Related Parties" means, with respect to a person or entity, its past, present and future subsidiaries and affiliates, and its and their respective shareholders, members, managers, directors, officers, employees, accountants, attorneys, financial advisors and agents, and any successors or assigns of any of the foregoing.

"Trustee" means the trustee appointed in this chapter 11 case pursuant to Bankruptcy Code section 1183.

## 1.2    Computation of Time

The provisions of Rule 9006(a) shall apply in computing any period of time prescribed or allowed by this Plan.

## ARTICLE II
## TREATMENT OF UNCLASSIFIED CLAIMS

## 2.1    Administrative Expense Claims

Except to the extent that the holder of an allowed administrative expense claim agrees to less favorable treatment, each such holder will receive payment of its allowed claim in full in cash on the later of the Effective Date and the date on which such claim becomes allowed, or as soon as reasonably practicable thereafter.

## 2.2    Priority Tax Claims

Except to the extent that the holder of an allowed priority tax claim agrees to less favorable treatment, each such holder will receive (a) payment of its allowed claim in full in cash on the later of the Effective Date and the date on which such claim becomes allowed, or as soon as reasonably practicable thereafter; or (b) installment payments in accordance with Bankruptcy Code section 1129(a)(9)(C).

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

## 3.1    Classification

The following table designates classes of claims and interests and specifies which classes are impaired or unimpaired and their voting status.

| Class | Designation | Status under Plan | Voting Status |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept |
| 2 | General Unsecured Claims | Impaired | Entitled to vote |

13

| Class | Designation | Status under Plan | Voting Status |
|-------|-------------|-------------------|---------------|
| 3 | Interests | Unimpaired | Deemed to accept |

### 3.2    Treatment

(a)    <u>Class 1—Priority Non-Tax Claims</u>

Except to the extent that the holder of an allowed priority non-tax claim agrees to less favorable treatment, each such holder will receive payment of its allowed claim in full in cash on the later of the Effective Date and the date on which such claim becomes allowed, or as soon as reasonably practicable thereafter.

(b)    <u>Class 2—General Unsecured Claims</u>

Except to the extent that the holder of an allowed General Unsecured Claim agrees to less favorable treatment, each such holder will receive payment of its allowed claim in full in cash, plus interest at the rate of 1%/year, compounded on the last business day of each calendar quarter, within three (3) years following the Effective Date.

(c)    <u>Class 3—Interests</u>

Upon the Effective Date, all holders of Interests in the Debtor shall retain such Interests.

### ARTICLE IV
### MEANS FOR IMPLEMENTATION

### 4.1    Source of Cash for Payments to Creditors

Payments to creditors under this Plan shall be made from the Debtor's earnings. In accordance with Bankruptcy Code section 1190(2), the Debtor shall submit its future earnings and other income to the supervision and control of the Trustee, but solely to the extent necessary to execute this Plan.

### 4.2    Estimation of Claims

FastForward's claim under the SAFE shall be estimated at $0 for all purposes, including for payment purposes, pursuant to Bankruptcy Code section 502(c). Entry of an Order confirming this Plan shall constitute the Court's approval of such estimation. The Debtor shall also have the right to seek estimation of any other contingent or unliquidated claim, pursuant to section 502(c).

### 4.3    Directors and Officers

Upon the Effective Date, the Debtor's prepetition directors, all identified in the unanimous written consent annexed to the Debtor's voluntary petition for relief, shall remain on the board, and shall serve without compensation, save reimbursement of their respective expenses, and Paul Snow and Jay Smith shall remain the Debtor's officers, and upon the Effective Date each shall be

paid not more than $15,000/month plus reimbursement of their respective expenses, in each case until such time as allowed claims under this Plan have been satisfied.

## 4.4    Preservation of Causes of Action

Any cause of action belonging to the Debtor's estate prior to the Effective Date shall vest in the Debtor on such date, including for the avoidance of doubt all causes of action arising from any statement made by FastForward concerning the SAFE or its rights thereunder (including those statements quoted above and including causes of action for tortious interference, injurious falsehood and defamation).

## 4.5    Setoff

Upon the Effective Date, the Debtor may, to the extent permitted by Bankruptcy Code section 558 or applicable non-bankruptcy law, set off or recoup from any claim on which payments are to be made, any cause of action that the Debtor may have against the holder of such claim.

## ARTICLE V
## PROVISIONS GOVERNING PAYMENTS

## 5.1    Debtor to Make Payments

The Debtor shall make all payments required by this Plan, whether confirmed under Bankruptcy Code section 1191(a) or (b).  Upon the Effective Date, all payments or funds received by the Trustee, if any, during this chapter 11 case shall be returned to the Debtor after deducting any fee owed to the Trustee.

## 5.2    Delivery of Payments

Payments required by this Plan shall be made by check mailed to the address set forth in any proof of claim; to the address set forth in any written notice of address change filed with the Court or provided to the Debtor or its counsel; or to the address set forth in the Debtors' schedules if no proof of claim has been filed and no written notice of address change has been filed or provided.

## 5.3    Time Bar to Cash Payments

Checks issued by the Debtor on account of allowed claims shall be null and void if not negotiated within sixty (60) days after issuance.  After expiration of such period, the creditor's payment shall irrevocably revert to the Debtor free and clear of any restrictions.

## 5.4    No Interest

Unless otherwise specifically provided for in this Plan, postpetition interest shall not accrue or be paid on any claim.

**5.5**     **Disputed Claims Reserve**

The Debtor shall establish a reserve for the payment of any Disputed Claim, to the extent such claim becomes allowed.   The amount set aside in the reserve for any Disputed Claim shall be the amount that would be paid on account of such claim if allowed in the lower of: (a) the amount set forth in the applicable proof of claim and (b) the estimated amount of such claim for payment purposes, as determined by the Court.

**5.6**     **No Payments on Disputed Claims**

No payment will be made on account of a Disputed Claim unless such claim has been allowed by final non-appealable order.

**5.7**     **Resolution of Disputed Claims**

The Debtor shall have the authority to settle and resolve any Disputed Claim on such terms as it deems appropriate without the need for Court approval.

**5.8**     **Claims Objection Deadline**

The Debtor shall have until one hundred and eighty (180) days following the Effective Date ("Claims Objection Deadline") to file objections to any Disputed Claim.   The Claims Objection Deadline may be extended on motion of the Debtor for cause, or on consent.    Any proofs of claim not objected to within the Claims Objection Deadline or resolved pursuant to Section 5.7 of this Plan shall be deemed allowed.

**5.9**     **Withholding Taxes**

The Debtor shall be entitled to deduct any Federal, state or local withholding taxes from any payments made under this Plan.  As a condition to making any such payment, the Debtor may require that the holder of an allowed claim provide its Taxpayer Identification Number and such other information and certification as may be deemed necessary for it to comply with applicable tax reporting and withholding laws.  Failure to provide such number, information or certification may result in forfeiture of such holder's right to payment on account of its claim.

**ARTICLE VI**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**6.1**     **Assumption/Rejection of Executory Contracts and Unexpired Leases**

The Debtor will be conclusively deemed to have rejected all of its executory contracts and unexpired leases as of the Effective Date, to the extent not previously assumed, assumed and assigned or rejected.

**6.2**     **Rejection Damages Claims**

Proofs of claim arising from the rejection of any executory contract or unexpired lease pursuant to this Plan must be filed with the Court within thirty (30) days following the Effective

Date.  All rejection damages claims filed after such date shall be deemed disallowed, without the need to file a formal objection pursuant to Bankruptcy Code section 502(b) and Rule 3007.

**ARTICLE VII**
**DISCHARGE, RELEASE AND INJUNCTION**

**7.1**    **Discharge**

If this Plan is confirmed under Bankruptcy Code section 1191(a), the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in Bankruptcy Code section 1141(d)(1)(A), except that the Debtor will not be discharged of any debt imposed by this Plan or to the extent provided in section 1141(d)(6).

If this Plan is confirmed under section 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan unless the Court grants a discharge on completion of all payments due within the first three (3) years of this Plan, or as otherwise provided in Bankruptcy Code section 1192.  The Debtor will not be discharged from any debt on which the last payment is due after the first three (3) years of the Plan, or as otherwise provided in section 1192.

**7.2**    **Release**

From and after the Effective Date, none of the Debtor's directors, officers or attorneys shall have or incur any liability to the Debtor for any act or omission occurring between the commencement of this chapter 11 case and the Effective Date relating to this chapter 11 case, except for such acts or omissions that amount to fraud, gross negligence or willful misconduct, as determined by final non-appealable order.

**7.3**    **Injunction**

**From and after the Effective Date, FastForward and its Related Parties shall be permanently enjoined from commencing or continuing any action against the Debtor or its Related Parties, or asserting or effecting any right of setoff or subrogation premised on the SAFE.**

**ARTICLE VIII**
**MISCELLANEOUS**

**8.1**    **Severability**

If any provision of this Plan is determined to be unenforceable, the determination will not limit or affect the enforceability or operative effect of any other provision.

**8.2**    **Binding Effect**

The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of its successors and assigns.

**8.3**    **Captions**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**8.4**    **Governing Law**

Unless a rule of law or procedure is supplied by Federal law, the laws of the State of Delaware govern this Plan and any agreements, documents or instruments executed in connection therewith, except as otherwise provided herein.

[Remainder of Page Left Blank]

18

Dated: July 15, 2020

Respectfully submitted,

FACTOM, INC.

/s/ Paul Snow
CEO