**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FACTOM, INC., [1] | Case No. 20-11602 (BLS) |
| Debtor. | |

## <u>SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION</u>
**(SUBCHAPTER V)**

Dated: July 29, 2020

Julia Klein (DE 5198)
KLEIN LLC
919 North Market Street, Suite 600
Wilmington, Delaware 19801
(302) 438-0456
klein@kleinllc.com

- and -

Jeffrey Chubak (pro hac vice)
AMINI LLC
131 West 35th Street, 12th Floor
New York, New York 10001
(212) 490-4700
jchubak@aminillc.com
*Attorneys for the Debtor*

---

[1] The Debtor's mailing address is 13492 Research Boulevard, P.O. Box 643, Austin, Texas 78750. The last 4 digits of its taxpayer identification number are 6915.

## TABLE OF CONTENTS

**Page**

BACKGROUND ................................................................................................................. 1

A.    Description and History of the Debtor's Business............................................. 1

    1.    The Platform ............................................................................................ 1

    2.    The Debtor's Business Prospects............................................................. 1

B.    Capital Structure .............................................................................................. 3

C.    Reasons for this Chapter 11 Case .................................................................... 3

    1.    Liquidation of SAFE Claim .................................................................... 3

    2.    Lease Rejection........................................................................................ 4

D.    Liquidation Analysis ........................................................................................ 4

E.    Ability to Make Future Plan Payments and Operate Without Further Reorganization ...... 5

ARTICLE I DEFINITIONS AND RULES OF CONSTRUCTION ............................ 5

1.1    Definitions and Rules of Construction............................................................. 5

1.2    Computation of Time ....................................................................................... 6

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS ..................................... 6

2.1    Administrative Expense Claims........................................................................ 6

2.2    Priority Tax Claims........................................................................................... 6

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........ 6

3.1    Classification..................................................................................................... 6

3.2    Treatment .......................................................................................................... 7

    (a)    Class 1—Priority Non-Tax Claims........................................................ 7

    (b)    Class 2—Secured Claims....................................................................... 7

    (c)    Class 3—General Unsecured Claims..................................................... 7

    (d)    Class 4—Interests.................................................................................. 7

ARTICLE IV MEANS FOR IMPLEMENTATION ................................................... 8

4.1    Source of Cash for Payments to Creditors....................................................... 8

4.2    Directors and Officers...................................................................................... 8

4.3    Setoff................................................................................................................. 8

4.4    Default; Accelerated Judgment........................................................................ 8

4.5    Comprehensive Settlement of Claims and Controversies Concerning the SAFE ............. 8

i

ARTICLE V PROVISIONS GOVERNING PAYMENTS ........................................................ 9

5.1     Debtor to Make Payments ........................................................................................ 9

5.2     Delivery of Payments ............................................................................................... 9

5.3     Time Bar to Cash Payments ..................................................................................... 9

5.4     No Interest ................................................................................................................ 9

5.5     Disputed Claims Reserve ......................................................................................... 9

5.6     No Payments on Disputed Claims ........................................................................... 9

5.7     Resolution of Disputed Claims ............................................................................... 9

5.8     Claims Objection Deadline .................................................................................... 10

5.9     Withholding Taxes ................................................................................................. 10

ARTICLE VI EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................... 10

6.1     Assumption/Rejection; Cure ................................................................................. 10

ARTICLE VII DISCHARGE AND RELEASE ....................................................................... 10

7.1     Discharge ............................................................................................................... 10

7.2     Release ................................................................................................................... 10

ARTICLE VIII MISCELLANEOUS ....................................................................................... 11

8.1     Severability ........................................................................................................... 11

8.2     Binding Effect ....................................................................................................... 11

8.3     Notice ..................................................................................................................... 11

8.4     Captions ................................................................................................................. 11

8.5     Governing Law ...................................................................................................... 11

## BACKGROUND

**A.    Description and History of the Debtor's Business**

1.    The Platform

The Debtor is a corporation organized under Delaware law in 2014.  In the years following its formation, the Debtor worked towards developing a platform that permits entities to maintain a time-stamped record of data that is permanently recorded on blockchain,[1] without the need for cryptocurrency exposure or costly infrastructure.  The platform is now fully developed, and the Debtor offers two products that provide access to it.[2]

The initial, principal focus of the Debtor's business was adapting the platform for use in connection with the mortgage origination and servicing process, so as to reduce costs associated with reviews, audits, servicing transfers and underwriting submissions through reduced time and increased accuracy of file and digital asset assembly.  Prior to the commencement of this case, the Debtor wound down that business segment.

The Debtor's current principal focus is adapting the platform for use by the Department of Homeland Security ("DHS") and other Federal agencies, as discussed below.

2.    The Debtor's Business Prospects

To the Debtor's knowledge, it is the first participant in the DHS Science and Technology Directorate, Silicon Valley Innovation Program ("SVIP") which is intended to provide funding for projects that deploy technology to solve problems faced by DHS and its sub-agencies.  Under the program, companies are provided a series of grants totaling up to $800,000 to develop and test technologies.  The Debtor previously won five grants totaling nearly $1.2 million.  Further information about the SVIP can be found at: https://www.dhs.gov/science-and-technology/svip.

The Debtor's first project was undertaken on behalf of the United States Customs and Border Protection agency ("CPB") and concerns the use of blockchain to secure data from sensors (principally cameras) located along the United States-Mexico border.  The Debtor has successfully completed all four phases of the project.  DHS has highlighted the Debtor's project on its website. E.g., https://www.dhs.gov/science-and-technology/blockchain-portfolio.

Successful completion of the four phases constitutes competitive procurement under the Competition in Contracting Act, and the Federal Acquisition Regulations promulgated thereunder,

---

[1] Blockchain is a public ledger, used to record transactions in a verifiable and permanent way. Blockchain was first used as the public transaction ledger for Bitcoin.

[2] The two products are Harmony Connect and Harmony Integrate.  Harmony Connect allows users to add blockchain capabilities to their systems as well as sophisticated digital identities and credentialing; however, it does not include implementation of the many digital identity implementations potentially available (although it can support any).  Harmony Integrate provides pre-built implementation of the W3C standard for digital identities and credentials fully implemented and tested on the Factom protocol on which the Debtor's platform operates.

1

and, as a result, the Debtor can sell up to $10 million of the resulting technology without going through a separate competitive bidding process.

Because the project was one of the first to be undertaken through the SVIP, certain aspects of the program had not been finalized; and as a result, the Debtor was not advised until after the fact that the technology developed needed to be packaged within a management, provisioning and deployment platform before it could be used within the CPB environment.  Still, DHS liked the Debtor's technology and suggested that the Debtor find a partner to provide the needed management platform and then revert to DHS.  The Debtor has found a partner with the required technology (Signal Garden) and they together have met with DHS to present a combined solution. The proposed, combined solution met with preliminary DHS approval and the Debtor and Signal Garden were asked to create a working demonstration.  The working demonstration has been created and presented to the SVIP office, where it was positively received.  The Debtor is presently working with the SVIP office to schedule a demonstration for CBP.  Upon making a successful demonstration, the Debtor anticipates going into procurement and contract negotiations which the Debtor anticipates taking 90-120 days.

If the subject technology is implemented along the United States-Mexico border, the Debtor expects the subject contract to be profitable.  The Debtor projects generating $100,000-$200,000 in revenue in the form of engineering and consulting fees in its first year.  Once the technological solution has been fully implemented the Debtor projects generating roughly $3 million/year in recurring "software as a service" revenue, given inter alia that the Debtor charges for the subject product based on its usage, the length of the border and the anticipated thousands of sensors that would be recording data.

In addition, DHS recently issued a new SVIP call with five different subject areas.  As part of the Debtor's fifth SVIP contract with DHS, the Debtor has developed digital identity and verifiable credential technology based on the W3C standard that is required for all submissions to the current call.  Of the seven companies participating in this SVIP call, the Debtor was one of only three able to fully pass DHS's compatibility tests.

Four partner companies have turned in submissions to this SVIP call using the Debtor's technology on a revenue sharing basis using the various subject areas.  The Debtor anticipates receiving 35%-40% of the approximately $800,000 in revenue each complete program will generate.  Furthermore, the resulting solutions will use the Debtor's "software as a service" solution generating ongoing, recurring revenue.  The proposals submitted include solutions addressing supply chain problems, alternate identifiers for social security and identification technology for essential workers.  The broad range of subject areas addressed demonstrates the broad applicability of the Debtor's technology.

In addition to working with DHS, the Debtor is a subcontractor on a project commissioned by the Department of Energy ("DOE") to protect the United States' electric grid from cyber-attack using blockchain technology. As is described in the final report for the first phase of the project, the Debtor developed a prototype demonstrating a proprietary "Validator/Accumulator" architecture for a private or hybrid private/public blockchain that organizes data on a blockchain that can be distributed over the electric grid.  This architecture can handle millions of transactions per second, covering multiple applications and use cases, and do so on relatively standard computer architectures.  In addition to high transaction rates, the architecture allows specification

2

of service levels, as data is collected, condensed, and pruned over time, keeping hardware requirements modest while delivering true blockchain security to the electric grid. The Debtor was awarded $57,000 in connection with the project's first phase.

The Debtor further anticipates the project's second phase, which will develop the above beyond prototype level, will result in commercially interesting technology which the Debtor will be able to sell to companies in the electricity generation and distribution industry. The Debtor anticipates generating revenues of $125,000 in the second phase.

The Debtor, in partnership with the University of North Texas, has also applied for a $100,000 grant in connection with a Department of Transportation project concerning application of blockchain technology to traffic control.

## B.    Capital Structure

The Debtor believes it has approximately $350,000 in debt, as described in its Schedule D and Schedule E/F, filed June 19, 2020 [D.I. 5], excluding lease rejection damages (discussed below) and approximately $60,000 owed under a D&O insurance premium financing agreement as to which obtained prior authorization to pay [D.I. 51].  Of the unsecured debt, $183,677 is attributable to a PPP loan under the CARES Act that may be forgiven in whole or in part. The deadline for filing proofs of claim is August 17, 2020, for all persons other than governmental units; and December 15, 2020 for governmental units [D.I. 20].  The Debtor has issued equity securities, ownership of which is as set forth in its list of equity security holders, filed pursuant to Rule 1007(a)(3) [D.I. 29].

## C.    Reasons for this Chapter 11 Case

1.    <u>Liquidation of SAFE Claim</u>

From 2015-17, the Debtor raised over $10 million from investors that included renowned venture capitalists Tim Draper of Draper Associates, Kuala Innovations, Harvest Equity and Peeli Ventures.[3]

The Debtor raised an additional $6 million pursuant to a Simple Agreement for Future Equity it entered into with FastForward Innovations Limited ("<u>FastForward</u>"), dated as of July 20, 2018 (as amended, the "<u>SAFE</u>"), a copy of which has been filed [D.I. 6].

The Debtor used capital raised by it from 2015-18 in order to inter alia pay its engineering team to build the subject platform and develop additional product features, build the Debtor's proprietary patent pool, develop a marketing and sales team, invest in tooling needed to minimize back-office overhead and cover other operating costs such as rent, utilities and insurance.

---

[3] In 2015-2016, the Debtor raised $400,000 at an $11 million valuation.  In 2017, the Debtor raised an additional $8 million Series A at a $38 million post-money valuation as part of an extended Series A round.  Holders of all Interests (defined below) in the Debtor are set forth in the Debtor's list of equity security holders.

The Debtor's initial plan proposed to estimate FastForward's claim under the SAFE at $0, pursuant to Bankruptcy Code section 502(c). FastForward disputed the proposed estimation, and moved to change the venue of this chapter 11 case to the United States Bankruptcy Court for the Western District of Texas [D.I. 38], and to dismiss this case, or alternatively, convert it to one under chapter 7 [D.I. 39]. Following direct negotiations between the Debtor's and FastForward's respective principals, followed by a telephonic settlement conference among them and the parties' respective counsel and the Subchapter V Trustee held July 22, 2020, the Debtor and FastForward have agreed to compromise their respective disputes on terms whereby FastForward's SAFE will be deemed to have converted to equity upon the Effective Date based on a conversion price of $1.015, resulting in the immediate issuance, on the Effective Date, of 5,911,330 Series A shares to FastForward and a total holding by FastForward in Factom of 6,311,330 Series A shares equal to 30.39% (excluding warrants) of the total issued capital, as reflected in the post-Effective Date capitalization table annexed hereto as Schedule 1 ("Post-Effective Date Capitalization Table").

During the parties' discussions, the Debtor represented that all outstanding warrants comprise two tranches of 412,579 and 147,457 shares, respectively, both with an $0.80 strike price and expiring in 2026; that in addition to these warrants, there are outstanding options for 989,000 shares all held by one person (a founder and former employee of the Debtor) with a strike price of $0.27 that are scheduled to expire in December 2020; that pending the Effective Date the Debtor will not be issuing any new share options; and that FastForward would be permitted informational rights as described below.

2.    Lease Rejection

The Debtor leased office space in the Stonecliff Building, located at 7801 North Capital of Texas Highway, Austin, Texas 78731 (Suite 240), commencing December 1, 2018. The lease term runs through May 31, 2024, and so the Debtor had approximately four years left as of the commencement of this case. Base rent was $9,818/month beginning July 1, 2020 and additional rent (common charges) was approximately $6,900/month. As the Debtor no longer needs the office space, which was used principally in connection with the its mortgage loan origination and servicing business segment which has since been wound down, the Debtor moved to reject this lease nunc pro tunc to the petition date, pursuant to Bankruptcy Code section 365. The Court entered an order granting said relief on July 13, 2020 [D.I. 53].

**D.    Liquidation Analysis**

Pursuant to Bankruptcy Code section 1129(a)(7), in order for this Plan to be confirmed, each creditor must either have voted to accept this Plan (or be deemed to have accepted this Plan), or this Plan must provide for each creditor to receive at least as much as it would as of the Effective Date if the Debtor were liquidated under Chapter 7 on such date. Section 1129(a)(7) is satisfied because this Plan provides for holders of allowed general unsecured claims—the only class of claims eligible to vote on this Plan—to receive compound interest on their respective allowed claims at a rate greater than that provided under 28 U.S.C. § 1961(a), made applicable by Bankruptcy Code section 726(a)(5). The Debtor also believes that if it were liquidated in chapter 7, the Debtor's platform and products would be nearly worthless without continued support from its management.

4

**E.      Ability to Make Future Plan Payments and Operate Without Further Reorganization**

In order for the Court to confirm this Plan, the Debtor must also demonstrate that it will have enough cash over the life of this Plan to make the payments required hereunder and operate the Debtor's business.

The Debtor is in advanced stages of negotiations with two investors who have completed due diligence and have expressed very strong interest in investing in the Debtor's business and technology.  The Debtor expects the prospective investors to collectively contribute not less than $1 million in its initial, post-reorganization investment round.  The Debtor has executed a term sheet with one investor.  The other is deeply connected to a $1 billion research lab ("Lab") that has access to a large pool of government research grants.  The Debtor has had discussions with the Lab's senior management and the feedback has been, that the Debtor's technology would likely add significant value to the Lab's blockchain projects and that there exists the potential for significant source of recurring "software as a service" and engineering revenue for the Debtor.  Thus, the Debtor anticipates generating revenue from these contracts by the first quarter of 2021.

Based on the above-described anticipated contracts, the Debtor projects achieving operational solvency in four to six months, and thereafter remaining profitable.  The Debtor's current business projections are annexed hereto as Schedule 2.  The Debtor further believes that there exist significant opportunities well beyond those described above.  For example, the Covid-19 pandemic has presented new opportunities as serious supply chain challenges have been brought to light that can be addressed by the Debtor's technology.

**You should consult with your accountant or other financial advisor if you have any questions concerning the Debtor's projections.**

**ARTICLE I**
**DEFINITIONS AND RULES OF CONSTRUCTION**

**1.1      Definitions and Rules of Construction**

The definitions and rules of construction set forth in Bankruptcy Code sections 101-102 shall apply when terms defined or construed in the Bankruptcy Code are used herein, and they are supplemented by the following definitions:

"Claims Objection Deadline" shall have the meaning ascribed to it in Section 5.8 of this Plan.

"Disputed Claim" means a claim or any portion thereof that has not been allowed or disallowed by final non-appealable order, and as to which: (a) a proof of claim has been filed and (b) an objection has been or may be timely filed, and any such objection has not been withdrawn, resolved or overruled by final non-appealable order.

"Effective Date" means the first business day following entry of an Order confirming this Plan on which payments under this Plan commence, provided the fourteen day stay under Rule

3020(e) is waived by the Court; and if it is not waived, the first business day that is fourteen days following entry of such Order on which payments under this Plan commence.

"General Unsecured Claims" means all claims listed on the Debtor's Schedule E/F not marked disputed, contingent or unliquidated, and any proof of claim filed against the Debtor, except to the extent that they assert secured status or priority status under Bankruptcy Code section 507(a).

"Interests" means all interests in the Debtor as specified in the Debtor's list of equity security holders, filed pursuant to Rule 1007(a)(3) [D.I. 29].

"Trustee" means the trustee appointed in this chapter 11 case pursuant to Bankruptcy Code section 1183.

## 1.2    Computation of Time

The provisions of Rule 9006(a) shall apply in computing any period of time prescribed or allowed by this Plan.

## ARTICLE II
## TREATMENT OF UNCLASSIFIED CLAIMS

## 2.1    Administrative Expense Claims

Except to the extent that the holder of an allowed administrative expense claim agrees to less favorable treatment, each such holder will receive payment of its allowed claim in full in cash, on the later of the Effective Date and the date on which such claim becomes allowed.

## 2.2    Priority Tax Claims

Except to the extent that the holder of an allowed priority tax claim agrees to less favorable treatment, each such holder will receive (a) payment of its allowed claim in full in cash on the later of the Effective Date and the date on which such claim becomes allowed, or as soon as reasonably practicable thereafter; or (b) installment payments in accordance with Bankruptcy Code section 1129(a)(9)(C).

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

## 3.1    Classification

The following table designates classes of claims and interests and specifies which classes are impaired or unimpaired and their voting status.

| Class | Designation | Status under Plan |
|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired |
| 2 | Secured Claims | Unimpaired |
| 3 | General Unsecured Claims | Impaired |
| 4 | Interests | Impaired |

**3.2**    **Treatment**

(a)    <u>Class 1—Priority Non-Tax Claims</u>

Except to the extent that the holder of an allowed priority non-tax claim agrees to less favorable treatment, each such holder will receive payment of its allowed claim in full in cash on the later of the Effective Date and the date on which such claim becomes allowed, or as soon as reasonably practicable thereafter.

(b)    <u>Class 2—Secured Claims</u>

Except to the extent that the holder of an allowed secured claim agrees to less favorable treatment, each such holder will receive, at the option of the Debtor, (i) cash in an amount equal to the allowed amount of such claim, on the later of the Effective Date and the date on which such claim becomes allowed; (ii) delivery of the collateral such allowed secured claim and payment of any interest required by Bankruptcy Code section 506(b); or (iii) such other treatment necessary to satisfy the requirements of Bankruptcy Code section 1129.  Each holder of an allowed secured claim shall retain the liens securing such claim as of the Effective Date until full and final satisfaction of the claim is made as provided herein, after which such liens shall be deemed released, terminated and extinguished, in each case without further notice to order of the Court, act or action under applicable law, or the consent of any person.

(c)    <u>Class 3—General Unsecured Claims</u>

Except to the extent that the holder of an allowed General Unsecured Claim agrees to less favorable treatment, each such holder will receive payment of its allowed claim in full in cash, plus interest at the rate of 1%/year, compounded on the last business day of each calendar quarter, within three (3) years following the Effective Date.  For the avoidance of doubt, FastForward shall not be entitled to an allowed General Unsecured Claim on account of the SAFE; rather, FastForward shall only be entitled to treatment as provided in Section 3.2(c).

(d)    <u>Class 4—Interests</u>

Upon the Effective Date, holders of Interests shall retain their respective Interests in the Debtor; <u>provided</u>, <u>however</u>, that in full and final satisfaction of FastForward's claims and rights under the SAFE, upon the Effective Date, the SAFE will be deemed to have converted to equity based upon a conversion price of $1.015, resulting in the issue of 5,911,330 Series A shares to FastForward and a total holding by FastForward in Factom of 6,311,330 Series A shares equal to 30.39% (excluding warrants) of the total issued capital, as reflected in the Post-Effective Date Capitalization Table.  Notwithstanding the foregoing, upon the Effective Date, FastForward shall continue to enjoy the same information rights as it enjoyed pre-Effective Date under the SAFE as conferred by the Debtor's bylaws and certificate of incorporation.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION

**4.1    Source of Cash for Payments to Creditors**

Payments to creditors under this Plan shall be made from the Debtor's earnings. In accordance with Bankruptcy Code section 1190(2), the Debtor shall submit its future earnings and other income to the supervision and control of the Trustee, but solely to the extent necessary to execute this Plan.

**4.2    Directors and Officers**

Upon the Effective Date, the Debtor's prepetition directors, all identified in the unanimous written consent annexed to the Debtor's voluntary petition for relief, shall remain on the board, and shall serve without compensation, save reimbursement of their respective expenses, and Paul Snow and Jay Smith shall remain the Debtor's officers, and upon the Effective Date each shall be paid not more than $15,000/month plus reimbursement of their respective expenses, in each case until such time as allowed claims under this Plan have been satisfied.

**4.3    Setoff**

Upon the Effective Date, the Debtor may, to the extent permitted by Bankruptcy Code section 558 or applicable non-bankruptcy law, set off or recoup from any claim on which payments are to be made, any cause of action that the Debtor may have against the holder of such claim.

**4.4    Default; Accelerated Judgment**

In the event of a post-Effective Date payment default by the Debtor under Sections 2.1, 2.2 or 3.2 of this Plan, the affected creditor may give notice to the Debtor of the default as provided in Section 8.3; and if the default is not cured and remains unresolved fourteen (14) days after such notice has been given, the Court may enter judgment in favor of the affected creditor and against the Debtor on motion of the affected creditor supported by an affidavit attesting as to the Debtor's payment default, the Debtor's failure to timely cure the same and the giving of notice to the Debtor as provided herein.

**4.5    Comprehensive Settlement of Claims and Controversies Concerning the SAFE**

Pursuant to Bankruptcy Code section 1123 and Rule 9019, and in consideration for the deemed conversion of the SAFE as provided herein, this Plan is and shall constitute a good faith compromise and settlement of all claims and controversies relating to the SAFE; and entry of the confirmation order shall be deemed constitute a determination that such compromise and settlement is fair, equitable and reasonable and in the best interests of the Debtor and its estate.

## ARTICLE V
## PROVISIONS GOVERNING PAYMENTS

**5.1**     **Debtor to Make Payments**

The Debtor shall make all payments required by this Plan, whether confirmed under Bankruptcy Code section 1191(a) or (b).  Upon the Effective Date, all payments or funds received by the Trustee, if any, during this chapter 11 case shall be returned to the Debtor after deducting any fee owed to the Trustee.

**5.2**     **Delivery of Payments**

Payments required by this Plan shall be made by check mailed to the address set forth in any proof of claim; to the address set forth in any written notice of address change filed with the Court or provided to the Debtor or its counsel; or to the address set forth in the Debtors' schedules if no proof of claim has been filed and no written notice of address change has been filed or provided.

**5.3**     **Time Bar to Cash Payments**

Checks issued by the Debtor on account of allowed claims shall be null and void if not negotiated within sixty (60) days after issuance.  After expiration of such period, the creditor's payment shall irrevocably revert to the Debtor free and clear of any restrictions.

**5.4**     **No Interest**

Unless otherwise specifically provided for in this Plan, postpetition interest shall not accrue or be paid on any claim.

**5.5**     **Disputed Claims Reserve**

The Debtor shall establish a reserve for the payment of any Disputed Claim, to the extent such claim becomes allowed.   The amount set aside in the reserve for any Disputed Claim shall be the amount that would be paid on account of such claim if allowed in the lower of: (a) the amount set forth in the applicable proof of claim and (b) the estimated amount of such claim for payment purposes, as determined by the Court.

**5.6**     **No Payments on Disputed Claims**

No payment will be made on account of a Disputed Claim unless such claim has been allowed by final non-appealable order.

**5.7**     **Resolution of Disputed Claims**

The Debtor shall have the authority to settle and resolve any Disputed Claim on such terms as it deems appropriate without the need for Court approval.

**5.8    Claims Objection Deadline**

The Debtor shall have until one hundred and eighty (180) days following the Effective Date ("Claims Objection Deadline") to file objections to any Disputed Claim.  The Claims Objection Deadline may be extended on motion of the Debtor for cause, or on consent.   Any proofs of claim not objected to within the Claims Objection Deadline or resolved pursuant to Section 5.7 of this Plan shall be deemed allowed.

**5.9    Withholding Taxes**

The Debtor shall be entitled to deduct any Federal, state or local withholding taxes from any payments made under this Plan.  As a condition to making any such payment, the Debtor may require that the holder of an allowed claim provide its Taxpayer Identification Number and such other information and certification as may be deemed necessary for it to comply with applicable tax reporting and withholding laws.  Failure to provide such number, information or certification may result in forfeiture of such holder's right to payment on account of its claim.

**ARTICLE VI**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**6.1    Assumption/Rejection; Cure**

Except to the extent that the Debtor has previously rejected an executory contract or unexpired lease, upon the Effective Date the Debtor will be deemed to have assumed all such contracts and leases with a cure cost of $0.

**ARTICLE VII**
**DISCHARGE AND RELEASE**

**7.1    Discharge**

If this Plan is confirmed under Bankruptcy Code section 1191(a), the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in Bankruptcy Code section 1141(d)(1)(A), except that the Debtor will not be discharged of any debt imposed by this Plan or to the extent provided in section 1141(d)(6).

If this Plan is confirmed under section 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan unless the Court grants a discharge on completion of all payments due within the first three (3) years of this Plan, or as otherwise provided in Bankruptcy Code section 1192.  The Debtor will not be discharged from any debt on which the last payment is due after the first three (3) years of the Plan, or as otherwise provided in section 1192.

**7.2    Release**

From and after the Effective Date, none of the Debtor's directors, officers or attorneys shall have or incur any liability to the Debtor for any act or omission occurring between the commencement of this chapter 11 case and the Effective Date relating to this chapter 11 case, except for such acts or omissions that amount to fraud, gross negligence or willful misconduct, as determined by final non-appealable order.

## ARTICLE VIII
## MISCELLANEOUS

**8.1    Severability**

If any provision of this Plan is determined to be unenforceable, the determination will not limit or affect the enforceability or operative effect of any other provision.

**8.2    Binding Effect**

The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of its successors and assigns.

**8.3    Notice**

Any notice required or permitted to be given to the Debtor by this Plan shall be given by e-mail to Paul Snow (paul@factom.com) and Jay Smith (jay@factom.com) with a copy to Jeffrey Chubak (jchubak@aminillc.com).

**8.4    Captions**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**8.5    Governing Law**

Unless a rule of law or procedure is supplied by Federal law, the laws of the State of Delaware govern this Plan and any agreements, documents or instruments executed in connection therewith, except as otherwise provided herein.


Dated: July 29, 2020                                Respectfully submitted,

                                                    FACTOM, INC.


                                                    /s/ Paul Snow
                                                    CEO